NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-799

ADOPTION OF EMRYS.[1]

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a trial, a judge of the Juvenile Court found the mother of six year old Emrys unfit and adjudicated Emrys in need of care and protection.  Although the judge also found that the mother's unfitness was not temporary, consistent with Adoption of Carlos, 413 Mass 339, 350-351 (1992), the judge scheduled a hearing, which was held seven months later, to assess whether the mother had made sufficient progress such that reunification with Emrys was a viable option.  At the conclusion of that hearing, the judge found that despite making some progress, the mother remained unfit and terminated her parental rights.  The judge also approved the adoption plan proposed by the Department of Children and Families (department), which was for Emrys to be

_____

[1] A pseudonym.

adopted by his paternal grandmother.  On appeal, the mother

contends that the judge erred in terminating her parental rights

in favor of adoption where less extreme measures were available,

such as a guardianship or an award of permanent custody.[2]  She

also claims that her right to due process was violated because

the judge was not "fair and impartial."  We affirm.[3]

Background.  We summarize the judge's unchallenged findings

of fact and conclusions of law as follows.  Emrys was born in

2017 when the mother was twenty-seven years old.  Emrys was the

mother's fourth child.  As discussed below, her three other

children were removed from her care and placed in the custody of

the father of two of those children, after a probate court

action in New Hampshire.[4]

The mother has a history of volatile romantic relationships

during which she has endured multiple episodes of domestic

violence.  Her first such relationship was with the biological

---

[2] The department contends that the mother has waived this argument because she did not present a competing plan.  Even if the claim is waived, we exercise our discretion to address it. See Adoption of Norbert, 83 Mass. App. Ct. 542, 545 (2013).

[3] Emrys has submitted a brief in support of affirming the decree.

[4] Although the mother's other children are not parties to this case, the judge included findings about the mother's relationship with them.  We consider them only to the extent they provide context for the mother's relationship with Emrys.

2

father of her oldest son (father 1).  That child was born when the mother was eighteen years old.  While in a relationship with father 1 the mother experienced physical and emotional abuse.  When the relationship ended, she obtained a permanent restraining order against father 1.

Years later, the mother entered into a romantic relationship with a man with whom she had two daughters (father 2).  The mother described the relationship with father 2 as abusive and, on one occasion in April 2014, she reported to the police that he punched her in the arm while her daughters were present.  The mother obtained a restraining order against father 2, which was in effect for about nine months.  After it expired, the two resumed their relationship, but it did not last and the mother soon became involved with Emrys's father (father 3).[5]

The mother and father 3 were together on and off from 2015 through 2019.[6]  The relationship ended in September 2019,

_____

[5] On the first day of the trial, father 3 entered a stipulation of permanent custody to the department.  He is not a party to this appeal.

[6] After Emrys's birth, the mother, father 3, and Emrys lived with the paternal grandmother and the mother's other children.  They later moved to the maternal grandmother's home in a neighboring city.  Then, in 2019, the mother and the children moved to a house in another nearby city.  There was evidence that the house was not well maintained, and when visiting, the paternal grandmother noted the home was dirty with feces on the floor.

following an incident of domestic violence in which father 3 pushed the mother into a wall, and she punched him in the face.

In February 2019, during a period when the mother and father 3 were not together, the mother met and allowed to move in with her and Emrys a man who was withdrawing from "crack" cocaine and feared relapsing. Within a few days, in Emrys's presence, the man attacked the mother. He punched her multiple times, and strangled her, causing significant bruising. The mother reported that the man threatened to kill her and Emrys, and the man was charged with attempted murder. At trial, the mother continued to defend her decision to permit this man to live in her home with her young child while he "detoxed," describing it as the humane thing to do.

The mother then met a man whom she dated from 2019 through 2020. The mother described this relationship as abusive also but testified that this man assaulted her only on one occasion. The judge did not credit this testimony.

In 2021, the mother and father 3 once again rekindled their relationship. Father 3, however, was still struggling with alcohol misuse. While spending time with Emrys, father 3 would arrive sober but sneak alcohol into the home and drink until he became intoxicated. The relationship between the mother and father 3 also continued to be abusive. In July 2021, the police

4

responded to the mother's home at about 12:30 A.M., after father 3 reported that the mother held a knife to his chest and that he grabbed the blade, injuring his thumb badly enough to require stitches. At trial, the mother claimed that father 3 walked into a knife she was carrying while she was eating birthday cake. The judge did not credit the mother's version of events and credited that of father 3. Emrys, then three years old, witnessed the altercation.

In 2022, the mother was seeing another man we will call Fred (a pseudonym). That relationship was also "fraught with violence." In April 2022, the mother was in her car at a parking lot and backed into Fred. The incident was seen by a police officer who arrested the mother. The mother was later charged with assault and battery by means of a dangerous weapon (ABDW) and assault and battery on a family or household member. She was subsequently convicted of ABDW. The mother continued to live with Fred in his home, with Emrys, and as the judge found, the violence did not abate. In May 2022, the mother called the police multiple times to report Fred's abuse which included, among other things, Fred becoming intoxicated and destroying items in the home; punching the mother in the leg; continuing to call, text, and threaten her and the children; and posting nude photographs of her online and sending them to a friend. On June

27, 2022, Fred pushed the mother down the stairs while she was holding Emrys; and, about two weeks later, on July 9, police responded to the home after the mother reported that Fred punched her in the face. The police noted injuries on the mother's face and arrested Fred. Emrys also witnessed these incidents. Following Fred's arrest, the department opened an investigation and obtained custody of Emrys a few days later, on July 12, 2022.[7] Emrys was placed with his paternal grandmother, who is now his preadoptive mother, where he remained through the duration of the trial and subsequent hearing.

By then, as previously noted, through a probate court action in New Hampshire, father 2 obtained custody of his and the mother's two daughters, as well as the mother's eldest son. The mother maintained that she lost custody of her older children due to a "botched divorce" and "false facts." The judge did not credit that testimony and found that the mother lacked insight into the children's awareness of and harm from violence in the home. The judge further found that the mother's explanation for the loss of custody of her other children

---

[7] The department also investigated several of the other instances of the mother's violent interactions with her romantic partners but did not remove Emrys on those occasions.

reflected the mother's unwillingness or inability to accept responsibility.

After Emrys's removal, the mother moved into a hotel room with her parents in New Hampshire, and the department developed an action plan.[8]  That plan required the mother to meet with the department's social worker monthly, sign releases for all services, communicate about pending criminal charges, attend intimate partner violence treatment, attend individual therapy, attend supervised visits, complete a neuropsychological evaluation, contact Emrys's school and providers to learn about Emrys's needs, complete a substance use evaluation, avoid violence, and obtain stable housing.

With few exceptions, the mother was largely unsuccessful in complying with the action plan.  At trial, the mother reported that she had completed a substance abuse evaluation on October 28, 2023, but she did not share the results with the department. The judge did not credit this testimony.  The mother also testified that she completed an eight-hour online course called "Survivors of Domestic Violence," where she received a certificate upon completion.  The judge did not credit this

---

[8] The mother was previously assigned an action plan in March of 2022.  All subsequent action plans contained substantially the same tasks.

7

testimony either as there was no evidence to support it.  The mother did briefly attend therapy through one provider, and she completed an intake with a different provider on March 31, 2023.[9] However, she missed the next scheduled appointment and was terminated from the program for noncompliance.  The mother did not re-engage in therapy until several weeks before trial.  The judge found that the mother's failure to engage in therapy was attributable to her belief that she did not need therapy and that she did not need education on intimate partner violence.[10]

The mother did, however, attend weekly, supervised visits with Emrys in the community where he lived.  The mother was on time and appropriate during these visits and, on January 5, 2024, she and Emrys began having unsupervised visits together.  The paternal grandmother also facilitated weekend telephone calls between the two.  Despite this regular contact, the judge found that the mother lacked an understanding of Emrys's specialized needs.

Emrys needed surgery to correct a cleft palate when he was a few weeks old.  He is followed by a medical team, which

---

[9] The neuropsychological evaluation supported a diagnosis of borderline personality disorder.

[10] The mother told her social worker and testified at trial that therapy was against her religion.

includes a dentist, a cleft palate specialist, an audiologist, and ear nose and throat specialists.  In February of 2022, the paternal grandmother took Emrys to the hospital, where he had a tonsillectomy, an adenoidectomy, and eleven rotten teeth extracted.  Emrys attends weekly physical therapy to address toe walking, tight cords, and a club foot that had to be surgically addressed.  Emrys is diagnosed with adjustment disorder unspecified and receives weekly in-home therapy sessions.  Emrys is also in speech therapy.  Academically, Emrys has performed well in school without the need of an individualized education program, however the mother testified that he required one.

In December 2023, the mother's social worker supplied the mother with a list of the names and telephone numbers of Emrys's providers.  The purpose was for the mother to gain knowledge and insight into Emrys's medical needs and appointments.  At the time of trial in March 2024, and at the subsequent hearing in October of 2024, the mother did not know any of Emrys's providers, nor had she attended any of his appointments.  Although the mother asserted that she received the names of Emrys's medical providers only around Christmas 2023 and called them in late December or early January 2024, the judge did not credit that testimony.  The judge found that the mother had ample time to obtain information about Emrys's medical needs

before trial and did not credit her testimony that the providers failed to return her calls for three months.

At the trial and subsequent hearing, the mother also stated she worked as a personal care attendant for her mother, earning $36,000 annually, and had recently began working as a car salesperson in training, earning $5,000 or $6,000 in July of 2024 alone. The mother moved to several different hotels and motels in New Hampshire and Massachusetts after Emrys's removal, ultimately settling into a room in a Massachusetts motel with her mother, stepfather, and brother. The mother testified she lives alone in a different room of the motel; however, the judge found that she "[was] not being truthful" about her living situation and her finances.

The judge credited all of the paternal grandmother's testimony and found that she provided excellent care, structure, organization, and long-term commitment for Emrys.

As previously stated, at the conclusion of the trial in March 2024, the judge found that the mother was unfit, adjudicated Emrys in need of care and protection, and committed Emrys to the permanent custody of the department. The department did not seek to terminate the mother's parental rights at the time, a decision which the judge questioned. The judge ordered the department to reconsider its plan for Emrys

10

and scheduled a hearing at which she would address whether termination of the mother's parental rights was in Emrys's best interests. In her findings issued following the trial, the judge explained there was

> "sufficient evidence that [the] [m]other was unfit, and that unfitness would continue unabated to a near certitude. The Court would have been prepared to terminate [the] [m]other's parental rights sua sponte, but given that none of the parties had planned for such an outcome, the Court did not find such a sudden goal change would be in Emrys's best interest."

On June 18, 2024, the department moved to terminate the mother's parental rights and changed its goal for Emrys to adoption.

The hearing was held a few months later in October 2024. The judge found that since the trial, the mother had not had a home visit with her social worker and rejected attempts by her social worker to schedule one. While the mother commendably began weekly sessions with a parent aide in May of 2024, by July, the service was terminated. The parental aide felt that the mother "was not meeting her goals, including calling [Emrys]'s providers, mastering time management, acquiring housing, or accessing reliable transportation." The mother also discontinued her therapy sessions after the March 2024 trial, and police responded to her motel room in June 2024, after a physical altercation between the mother and another resident of the motel. Following the hearing in October 2024, the judge found that "said unfitness is likely to continue into the

11

indefinite future to a near certitude" and terminated the mother's parental rights. She also approved the department's plan for Emrys to be adopted by his paternal grandmother.

Discussion. 1. Termination of the mother's parental rights. "To terminate parental rights to a child, the judge must find, by clear and convincing evidence, that the parent is unfit and that the child's 'best interests will be served by terminating the legal relation between parent and child.'" Adoption of Helga, 97 Mass. App. Ct. 521, 527 (2020), quoting Adoption of Luc, 484 Mass. 139, 144 (2020). As "the termination of parental rights is an 'extreme step,' we require that the judge articulate specific and detailed findings in support of a conclusion that termination is appropriate, demonstrating that she has given the evidence close attention." Adoption of Helga, supra, quoting Adoption of Nancy, 443 Mass. 512, 514-515 (2005).

The mother argues that the termination of her parental rights was not in Emrys's best interests, particularly where other less extreme options were available such as giving the paternal grandmother permanent custody or guardianship. "[W]e defer to the judge's determinations regarding the best interests of the child, and reverse only where there is a clear error of law or abuse of discretion." Adoption of Cadence, 81 Mass. App. Ct. 162, 166 (2012).

12

We discern no error or abuse of discretion.  The judge's factual findings and legal conclusions were detailed and reflect a careful, "even handed" consideration of the evidence (citation omitted).  Adoption of Hugo 428 Mass. 219, 226 n.8 (1998), cert. denied sub nom. Hugo P. v. George P., 526 U.S. 1034 (1999).  The mother's extensive history of engaging in abusive relationships was well documented, as was her inability to understand the negative impacts on Emrys of these relationships and the domestic violence she endured (and participated in).  She consistently maintained that the violence in her multiple relationships was minimal and would not acknowledge that Emrys's need for trauma therapy was a result of witnessing that violence.  See Custody of Vaughn, 422 Mass 590, 599 (1996) ("It is well documented that witnessing domestic violence, as well as being one of its victims, has a profound impact on children").  She also lacked insight into the reasons why Emrys was removed from her custody.  At the time of the hearing, the mother still had not secured adequate housing or employment.  Although the mother made some progress by working as her mother's personal care attendant and as a car salesperson in training, her "living situation remain[ed] unclear" at the hearing in October 2024.  The mother consistently rejected services the department offered to coordinate for her, including for therapy, substance misuse

13

treatment, and a parental aide (until shortly before the hearing). "In these circumstances, the judge could reasonably conclude that termination of the mother's parental rights was necessary . . . ." Adoption of Helga, 97 Mass. App. Ct. at 528. In sum, the judge's finding that mother lacked the parenting skills required to provide Emrys with a safe, protective and nurturing environment, in which his specialized needs could be provided for, was based on clear and convincing evidence.

Moreover, as the judge correctly observed, Emrys deserves "permanence and stability." Adoption of Nancy, 443 Mass. 512, 517 (2005). See Adoption of Helga, 97 Mass. App. Ct. at 529. Neither our case law nor the statute "requires the judge to investigate adoption plans not proposed by the department or the parent, or to choose 'a placement which is least restrictive of familial rights.'" Id., quoting Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, 376 Mass. 252, 266 (1978). The judge found "[Emrys] has a very strong bond with his paternal grandmother," and that she has "diligently provided for his medical, psychological, and educational needs," ensuring him "a safe, stable, and continuous environment with a willing and able caretaker who loves him." "Although the mother's fundamental rights [we]re at stake [in these proceedings], the best interests of the child [we]re paramount." Adoption of

14

Helga, supra.  The judge properly determined that "this case is one in which providing stability in [Emrys's] li[fe] is properly eased by termination."  Id.

2.  The mother's allegation of a due process violation.[11] The mother also argues that her right to due process was violated because the judge improperly prejudged her and determined that her parental rights should be terminated before the judge held the hearing.  She contends that the hearing was "a sham," which "deprived [her] of a meaningful opportunity to present her case."  We are not persuaded.

As we have explained, the judge found after trial that there was "sufficient evidence that [the] [m]other was unfit, and that unfitness would continue unabated to a near certitude." However, she did not terminate the mother's parental rights in March 2024, because "none of the parties had planned for such an outcome."  This lack of preparation precluded a proper inquiry whether termination of parental rights was in Emrys's best interests at that time.  The judge's decision to leave this question open and schedule a hearing was well within her

---

[11] We note that Emrys argues the mother has waived this issue for failing to raise it at trial.  We agree with Emrys that constitutional issues cannot be raised for the first time on appeal.  See Adoption of Yalena, 100 Mass. App. Ct. 542, 554-555 (2021).  Nonetheless, we choose to address the issue.

15

discretion.  See Adoption of Karla, 46 Mass. App. Ct. 64, 67

(1998) ("[t]he Supreme Judicial Court in Adoption of Carlos, 413

Mass. at 350-351, impliedly approved postponing final judgment

in [G. L.] c. 210 cases to permit the judge to reconsider

parental fitness beyond the time of trial and into the future").

The judge explained the reasons for her decision and informed

the mother what was required of her to avoid termination of her

parental rights.  At the conclusion of the trial, the judge

said:

> "if in the next three months, she comes in saying, I have
> accountability for how the case came in.  I understand what
> happened.  I understand what I need to do to treat my
> borderline personality disorder.  And I also understand why
> I go from relationship to relationship to relationship and
> still live with my parents and rely on them financially
> yet.  You know, you said that she's a young mom. . . .  So
> the department needs to convene another [permanency
> planning conference].  And if in the next three months,
> things are not vastly different, I'm going to address the
> other prong of potential termination.  Permanent custody
> with the [d]epartment.  Let's look at a date in three
> months from today."

It is evident that, contrary to the mother's assertion, the

judge expressed a willingness to consider evidence of the

mother's improvement, showing she "ke[pt] an open mind until all

the evidence [was] presented and both sides [had] rested."

Adoption of Tia, 73 Mass. App. Ct. 115, 121-122 (2008).

Moreover, the judge's findings and conclusions of law following

the evidentiary hearing reflect the same reasoned consideration

16

she gave the mother in her findings after the trial.  In light of that and our earlier discussion, we cannot say the judge prejudged the mother's parental ability.  See <u>Adoption of Iliana</u>, 96 Mass. App. Ct. 397, 407-408 (2019) ("The trial judge is presumed to be a neutral arbiter in any matter before . . . her, regardless of whether the judge has previously been involved with the parties, the issues, or the case").

<u>Decree affirmed</u>.

By the Court (Vuono, Henry & Singh, JJ.[12]),

Clerk

Entered:  July 10, 2026.

---

[12] The panelists are listed in order of seniority.

17